UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NONA FARRAR,<br><br>          Plaintiff,<br><br>          v.<br><br>MICHAEL A. GROCHOWIAK, individually and in his official capacity, MICHAEL D. HOSKINS, individually and in his official capacity, JULIE MARKIN, RICHARD M. DALEY, individually and in his official capacity, and the CITY OF CHICAGO, a municipal corporation,<br><br>          Defendants. | No. 03 C 6193<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM ORDER AND OPINION

In September 2003, the City of Chicago rejected Plaintiff Nona Farrar's application for a home occupation business license. Plaintiff, an African-American woman, believes the denial was motivated by her race, her prior lawsuits against the City, and her various other "First Amendment activity." Proceeding *pro se*, Farrar now brings suit against the City of Chicago; Michael Hoskins, an Investigator for the City's Department of Zoning; Michael Grochowiak, the Director of Code Enforcement in the City's Department of Zoning; and Mayor Richard Daley. Specifically, Plaintiff brings: (1) a § 1983 claim based on violation of her equal protection rights (Count I); (2) a First Amendment retaliation claim (Count II); (3) a § 1983 claim based on violation of her due process rights (Count III); (4) a state law claim of intentional infliction of emotional distress (Count IV); (5) a claim of unlawful interference with prospective economic advantage (Count V); (5) a claim against Defendants Grochowiak and Hoskins for "willful and wanton conduct" (Count VI); (6) a claim of *Monell* liability against Defendant Richard Daley and the City of Chicago for violation of her First and Fourteenth Amendment rights (Count VII); and (7) a facial challenge to the Zoning Ordinance

under §§ 1983, 1982, and 1981 (Count VIII).[1] Defendants move for summary judgment. For the reasons explained below, Defendants' joint motion for summary judgment is granted as to Plaintiff's federal claims. All remaining state law claims are dismissed without prejudice to litigation of those claims in state court.

## FACTUAL BACKGROUND

In late summer 2003, Plaintiff learned through an internet posting that the Chicago Transit Authority was accepting bids for a mass mailing contract (the "CTA contract"). (Plaintiff's Deposition, Defendants' Ex. D, at 77.) The CTA contract involved the monthly distribution of new employment kits, which included lunch sacks, maps, pens, cardholders, and welcome letters. (Defendants' Joint Local Rule 56.1(a) Statement, hereinafter, "Defs.' 56.1(a)," ¶¶ 32 37; CTA Contract Documents, Defendants' Ex. L.) It also required the winning bidder to store the materials, consisting of hundreds of boxes weighing thousands of pounds. (Defs.' 56.1(a) ¶ 37.) In order to enhance her chances of being awarded the contract, Plaintiff attempted to establish her business as a certified minority business enterprise (MBE). (Defs.' 56.1(a) ¶ 33.) Because she intended to run the mass mailing operation from her home, she required a home occupation business license from the City. (Id.)

On September 3, 2003, Plaintiff applied for a home occupation business license. (Defendants' Joint Local Rule 56.1(a) Statement, hereinafter, "Defs.' 56.1(a)," ¶¶ 8, 12.) Plaintiff submitted her application in person, initially to a woman named Grace in the Department of Revenue. (Plaintiff's Deposition, at 106.) Her application stated that she lived in a 1200 square foot unit within a multiple-dwelling building, and that 500 square feet of her unit would be used for her proposed home occupation business. (Id. ¶ 9.) After examining her application, the Department of Revenue employee informed Plaintiff that she would have to speak with a person

---

[1] In an order dated June 14, 2004, the court dismissed a §1983 conspiracy claim. The court also dismissed all claims brought against Julie Markin, a former employee of the Marc Realty Corporation, for lack of subject matter jurisdiction.

in the Department of Zoning before her license could be issued. (*Id.*)

Plaintiff proceeded to the Department of Zoning, where she spoke with Defendant Grochowiak. (*Id.* at 111.) Grochowiak informed Plaintiff that her license application was being denied because her proposed home business violated the storage restrictions placed on home occupancy businesses under the City's zoning code. (*Id.* at 114.) Specifically, the Chicago Municipal Code section that addresses home occupations states:

> [T]he total square footage of any home occupation shall not permanently occupy more than . . . 15 percent of the floor area of any unit in a multiple dwelling building; provided, however, that in no instance may one or more home occupations in any single dwelling unit permanently occupy more than 300 square feet of any dwelling unit . . .

City of Chicago Zoning Ordinance, Ch. 4-380-060(g). Plaintiff's proposed home-based business violated both of these requirements: she expected to use 500 feet of her dwelling for the business, an area totaling far more than 15 percent of her total 1200 square feet. Plaintiff advised Grochowiak that she intended to rent space in an offsite storage facility in which to store the materials related to her home business. (Plaintiff's Deposition, at 115.) Grochowiak explained that home-based businesses are prohibited, under the Zoning Ordinance, from storing anything offsite. (*Id.* at 114.) Specifically, the Zoning Ordinance provides that "the home occupation and all related activities, including storage, shall be conducted completely within the dwelling and shall not be operated from an accessory structure or garage." City of Chicago Zoning Ordinance Ch. 4-380-060(f).

A dispute ensued between Plaintiff and Grochowiak. (Plaintiff's Deposition, at 115-17.) Eventually, Plaintiff asked to speak to somebody else, at which point Grochowiak left and Defendant Hoskins appeared. (Hoskins's Deposition, Defendants' Ex. B, at 90.) Hoskins spoke with Plaintiff, reiterating the reasons already laid out by Grochowiak for the denial of her license. (*Id.* at 99-100.) Plaintiff then asked Hoskins whether she could change her application to seek

3

approval for the operation of a data entry business rather than the mailing project.[2] (Defs.' 56.1(a) ¶ 14; Hoskins's Deposition, at 93.) Hoskins claims he repeatedly asked Plaintiff who her clients would be for this new data entry business and she refused to answer. (Hoskins's Deposition, at 91.) Plaintiff, on the other hand, maintains that she told Hoskins that she would be doing data entry work for the city and state governments. (Plaintiff's Response to Defs.' 56.1(a) ¶ 15.) In any event, Hoskins informed Plaintiff that her application for a license to conduct a home-based data entry business was also denied. (Defs.' 56.1(a) ¶ 15; Plaintiff's Response to Defs.' 56.1(a) ¶ 15.) Following this second denial, Hoskins gave Plaintiff an appeals packet and told her that she could appeal the denial of her license application to the Zoning Board of Appeals. (Defs.' 56.1(a) ¶ 16; Plaintiff's Deposition, at 127.) Ultimately, Plaintiff chose not to appeal the denials because she did not believe that the appeals process would have been completed in time for her to submit a bid for the CTA contract. (Plaintiff's Deposition, at 127-28, 130.) Instead, she filed this lawsuit the following day, September 4, 2003.

Prior to this incident, Plaintiff had been involved in a number of disputes with the City of Chicago. A self-styled community activist, Plaintiff maintains that she has been "very outspoken" about police misconduct and has sued the City of Chicago on a number of occasions. (Compl. at 1.) In the course of her community activism, Plaintiff claims to have assisted victims of police abuses by referring them to the United States Attorney, participated in rallies, spoken at meetings regarding police brutality, and been arrested seven times.[3] (Defs.' 56.1(a) ¶ 27.) In short, Plaintiff "consider[s] [her]self someone who speaks out against various civil and human rights abuses."

---

[2] Although Plaintiff does not explain her intent, she apparently intended to apply for a business license in order to become a certified MBE before obtaining future data entry contracts that would, presumably, not require as much storage as the CTA contract.

[3] Plaintiff discussed her "First Amendment activities" during her deposition, though she refused to provide full details regarding all of her claimed arrests and activism, continually repeating "I don't remember," "It's so long ago," and "I'm not sure" when pressed for details. (Plaintiff's Deposition, at 33-45.)

4

(Plaintiff's Deposition, at 31.)

In 2002 or 2003,[4] Plaintiff attempted to launch a company called Larger Vision Inc., as a branch of "the [I]nnocence [P]roject to investigate claims of wrongful convictions involving Chicago police and other officers." (*Id.* at 29.) The company's articles of incorporation, which were filed with the Illinois Secretary of State on June 13, 2003, identify the company's purpose as "[t]o research and investigate claims of innocence and other injustices that are civil rights violations and to coordinate special events to fund the project." (Plaintiff's Ex. 19.) Plaintiff also obtained a business license from the City of Chicago for Larger Vision. The business license application, submitted on September 13, 2003, describes the company's business activity as "administrative office for special event planner for different events, civil, human rights causes."[5] (Plaintiff's Deposition, at 44-48; Defendants' Ex. I.) Ultimately, Plaintiff abandoned the Innocence Project idea after she had spoken with a number of attorneys about participating in the project, but before the company was up and running.[6] (Plaintiff's Deposition, at 52-53.) Instead, Plaintiff "decided it would be better for me to do maybe special events to help organizations out that I felt were worthy of financial support." (*Id.* at 53.)

In her complaint, Plaintiff also refers to a number of lawsuits she has previously filed against the City. Specifically, Plaintiff alleges that she "has sued Corporation Council [sic] lawyers for

---

[4] On a number of occasions during her deposition, Plaintiff states that she began her attempt to form an "Innocence Project" organization in the fall of 2002. As discussed below, however, her business records pertaining to this organization are all dated summer or fall of 2003. Plaintiff has not explained this discrepancy. It is possible that she got the date wrong when discussing events during 2002, or that she first began working on the project in 2002, but only completed the paperwork in 2003.

[5] Before applying for the Larger Vision business license, Plaintiff had secured office space outside of her home. Thus, she did not seek or obtain a home occupation business license for Larger Vision. (Defendants' Ex. I.)

[6] The reasons behind Plaintiff's abandonment of her Larger Vision project are unclear. During her deposition, Plaintiff stated that in the fall of 2002 she had already begun receiving letters from prisoners, though she had not yet done any advertising. Feeling that she "would just be swarmed," she says she "decided I probably better not do this." (Plaintiff's Deposition, at 53.)

5

destruction of evidence . . ., sue [sic] the city and police and won, spoken out about police abuses [and] fire abuses, assisted victims of the abuses and filed complaints against the police and firemen." (Compl. ¶ 11.) Plaintiff has offered no evidence of these prior lawsuits, and when asked about them during her deposition, remembered only that she had sued Chicago Police Officer James Davis in 1995. (Plaintiff's Deposition, at 27.) Court records show that Plaintiff filed suit against Office Davis in September 1997. The case settled in 2000 after Plaintiff retained counsel. *Nona Farrar v. James Davis*, No. 97 C 6433 (N.D. Ill. Aug. 3, 2000) (dismissing all claims pursuant to settlement agreement). As for the remaining lawsuits, Plaintiff stated that "I would think that your [defense counsel's] office would have those records because I generally filed suit against the City of Chicago." (Plaintiff's Deposition, at 27.) An examination of this court's records shows that Plaintiff has filed suit in this court against the City of Chicago or City of County officials on at least five other occasions prior to the current lawsuit. *Farrar v. City of Chicago*, No. 82 C 6771 (complaint filed Nov. 3, 1997 against the City of Chicago); *Farrar v. Glantz.*, No. 00 C 275 (complaint filed Jan. 14, 2000 against Clerk of the Cook County Circuit Court); *Farrar v. Nelson*, No. 00 C 1675 (complaint filed Mar. 17, 2000 against Chicago Police and Fire Department employees); *Farrar v. City of Chicago*, No. 02 C 2914 (complaint filed April 23, 2002 against a number of City employees, including members of the Police and Fire Departments and Office of Emergency Communications); *Farrar v. Bracamondes*, No. 03 C 5530 (complaint filed Aug. 8, 2003 against Chicago police officers alleging, *inter alia* First Amendment retaliation, due process and equal protection violations stemming from police failure to arrest Plaintiff's sister after domestic dispute). In addition, since the present events, Plaintiff has filed an additional suit against, *inter alia*, the City of Chicago. *Farrar v. Eldibany*, No. 04 C 3371 (complaint filed May 12, 2004 against landlord and City building inspectors for, *inter alia*, conspiring to ignore building code violations at

her apartment building).[7]

Plaintiff now claims that the denial of her business license was motivated by both her race and as retaliation for her past disputes with the City of Chicago and protests over City policies. Defendants have moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is only appropriate "if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003), quoting *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001). Although in doing so, the court will construe all inferences in favor of the non-moving party, the court is "not required to draw every conceivable inference from the record." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004), quoting *Rogers*, 320 F.3d at 752; *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004). Thus, "[i]nferences that are supported only by conjecture or speculation will not defeat a summary judgment motion." *Id.* Plaintiff brings four types of federal claims – § 1983 equal protection, First Amendment retaliation, § 1983 due process, and §§ 1981, 1982, and 1983 claims based on the First and Fourteenth Amendments – as well as a number of additional state law claims. The court will examine the federal law claims in turn.

I.  **Equal Protection Claims**

In the complaint, Plaintiff alleges that her business license application was denied due to her race as well as her prior constitutionally protected speech. Although Plaintiff does not fully

---

[7] Although, as noted, Plaintiff's lawsuit against Office Davis resulted in a settlement, it appears that all remaining lawsuits have been dismissed, either on Rule 12 motions or on summary judgment.

7

elaborate the basis of her claims, the allegations in the complaint are sufficient to maintain two types of equal protection claims. First, Plaintiff could bring a claim based on equal protection's prohibition on discrimination on the basis of membership in a historically mistreated class. Second, Plaintiff could bring a so-called "class of one" equal protection claim. See *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). The court will examine Plaintiff's two potential equal protection claims separately.

### A. Race-based Claim

The Equal Protection Clause protects "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."). In order to maintain a § 1983 claim on the basis of an equal protection violation, a plaintiff "must show that the defendants acted with a nefarious discriminatory purpose, and discriminated against him based on his membership in a definable class." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (citations omitted). As the Seventh Circuit has explained:

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of person aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (internal quotations omitted); *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 752 (7th Cir. 1999); *Nabozny*. 92 F.3d at 453-54. Thus, "[t]o show a violation of the Equal Protection Clause, plaintiffs must prove that defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001) (citations omitted).

8

In this case, Plaintiff has failed to point to any evidence of racial animus behind the denial of her license application. She admits that Grochowiak and Hoskins "did not say anything racially discriminatory to [her]." (Plaintiff's Deposition, at 137.) Her allegation of racial animus is based solely on the fact that Defendant Grochowiak is white and rejected, erroneously in her view, her license application. In Plaintiff's words, "any time you have a Caucasian who is an attorney, someone in a position of authority who represents the City in these matters telling you something that's totally off base, one can deduce that you have a racial problem." (Plaintiff's Deposition, at 206-07.) Plaintiff has not articulated what Grochowiak said that was "totally off base." She merely insists, contrary to the plain meaning of the Zoning Ordinance cited above, that the home occupation ordinance does not "forbid home based business owners from renting outside storage spaces for storage." (Pl.'s Res. to Defs.' 56.1(a) ¶ 13.) As for the fact that Defendant Hoskins is African-American, Plaintiff maintains that Hoskins was "bowing down" to his superior, and that there are "some African-Americans who may be dark on the outside and may be something else on the inside." (Plaintiff's Deposition, at 207-08, 211.) Such unsupported allegations of racial animus are insufficient to maintain an equal protection claim. *Samuel v. City of Chicago*, 41 F. Supp. 2d 801, 805 (N.D. Ill. 1999) ("The mere fact that [plaintiff] is an African-American and [defendants] are white does not evince that Defendants invidiously singled out him as an African-American for disparate treatment, nor that they selected their course of action at least in part for the purpose of causing its adverse effects on [plaintiff] as an African-American.").

Nor does Plaintiff have any indirect evidence that the City enforced its zoning requirements in a discriminatory manner. "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Chavez*, 251 F.3d at 636, *citing Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 944-45 (7th Cir. 1996). Plaintiff herself admits that

9

she has no evidence that she was treated differently than any similarly situated applicant. (Plaintiff's Res. to Defs.' 56.1(a) ¶ 24.) Nor has Plaintiff provided any statistical evidence demonstrating the existence of discrimination.[8] See Chavez, 251 F.3d at 637-38. She has not, for example, suggested that white applicants were exempt from the storage regulations. In the absence of such evidence, Plaintiff cannot maintain an equal protection claim based on racial discrimination.

### B. "Class of One" Claim

Plaintiff's equal protection claim can also be construed as a "class of one" case insofar as she alleges that she was treated differently than other applicants due to her prior First Amendment activity. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court recognized that an equal protection claim may arise where a plaintiff alleges that she has been intentionally treated differently than similarly situated individuals and where there was no rational basis for the disparate treatment. Thus, the Equal Protection Clause "provides a remedy when a 'powerful public official pick[s] on a person out of sheer vindictiveness.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001), quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). A plaintiff bringing a so-called "class of one" claim bears the burden of proving that she has suffered intentional, irrational, and arbitrary discrimination. *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004), citing *Olech*, 528 U.S. at 564-65. Under any formulation of this theory, Plaintiff "must demonstrate that [she was] treated differently than someone who is *prima facie* identical in all relevant aspects." *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002), citing

---

[8] During her deposition, Plaintiff stated that she had received a letter from an African-American man who claimed to have been denied a business license due to his race. (Plaintiff's Deposition, at 191-93.) In the letter, a Mr. Marcus Stewart states that zoning department employees required him to submit at least two affidavits from companies that he would be doing business with as well as proof of a business website. (Defendants' Ex. M.) Mr. Stewart did not, however, claim that he was the victim of racial discrimination. His letter states that he had "an unpleasant experience," but did not ascribe the encounter to racial discrimination. (*Id.*) Moreover, Mr. Stewart's letter indicates that he did receive a business license from the City.

10

*Indiana State Teachers Ass'n v. Board of Sch. Comm'rs*, 101 F.3d 1179, 1181-82 (7th Cir. 1996).

Again, Plaintiff cannot succeed on a "class of one" claim because she has not identified any person who was similarly situated but treated differently. The Seventh Circuit has imposed "an especially high burden with regard to establishing someone who is similarly situated in the context of 'class of one' equal protection claims." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1003 (7th Cir. 2004), citing *Bell*, 367 F.3d at 708-09. Plaintiff has not even attempted to meet the "similarly situated" requirement, and her equal protection claim is thus suitable for summary judgment. *McDonald*, 371 F.3d at 1002 ("[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement had been met.").

## II. First Amendment Retaliation Claim

Plaintiff also brings a First Amendment retaliation claim on the grounds that her license application was denied in retaliation for her prior lawsuits against the City of Chicago and various City agencies and employees. To maintain a First Amendment retaliation claim, a plaintiff must establish (1) that she engaged in a constitutionally protected activity and (2) that the protected conduct was a "substantial or motivating factor" in defendants' challenged action. *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), citing *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004); *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). After a plaintiff has established these two elements, the burden shifts to the defendant to show that the same action would have been taken in the absence of the protected activity. *Id.*[9]

Regarding the first prong, Defendants argue that Plaintiff has presented no evidence that

---

[9] Although *Spiegla*, like most First Amendment retaliation cases, occurs in the employment context, a First Amendment retaliation claim may be brought outside of the employment context. As the Seventh Circuit has noted, "[a]ny deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else . . . ." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (citations omitted); *see also The Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1144-46 (N.D. Ill. 2001) (discussing the distinction between First Amendment retaliation claims inside and outside of the employment context).

11

she engaged in constitutionally protected conduct. Plaintiff, on the other hand, cites her past litigation against the City, as well as her civil rights work and attempted formation of an "Innocence Project" business as First Amendment activity motivating the denial of her business license.

For purposes of this case, the court will assume that Plaintiff has engaged in constitutionally protected activity sufficient to meet the first prong of the retaliation test. Although Plaintiff herself has failed to present evidence of her prior lawsuits against the City and its employees, an examination of court records reveals that she had filed at least six such lawsuits prior to the present case. These past lawsuits against the City and its employees constitute First Amendment activity sufficient to maintain her retaliation claim. *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) ("Retaliation for filing a lawsuit is prohibited by the First Amendment's protection of free speech.") (citations omitted).

For purposes of this decision, the court can assume that Plaintiff's attempted formation of an advocacy business also satisfies the first prong of the retaliation inquiry. According to the articles of incorporation for Larger Vision LLC, filed with the Illinois Secretary of State on June 13, 2003, the company's purpose was "[t]o research and investigate claims of innocence and other injustices that are civil rights violations and to coordinate special events to fund the project." (Plaintiff's Ex. 19.)[10] Although Plaintiff ultimately abandoned her "Innocence Project" organization before it got off the ground, she testified that she had spoken with and sought the assistance of a number of attorneys during the planning stages. (Plaintiff's Deposition, at 52.) The Supreme Court has recognized that "collective action undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 585 (1971); *In re Primus*, 436 U.S. 412, 426 (1978).

---

[10] Plaintiff also presents a copy of her application for a business license for Larger Vision, which describes the company's business activity as "administrative office for special event planner for different events, civil, human rights causes," (Defendants' Ex. I), but this application was not filed until September 13, 2003, after the alleged retaliation occurred.

12

Plaintiff's effort to form an organization devoted to "engag[ing] in litigation as a vehicle for effective political expression and association" falls within the realm of the First Amendment. *In re Primus*, 436 U.S. at 431.

Plaintiff's retaliation claim nevertheless fails because she has offered no evidence demonstrating that her protected activity was a motivating factor behind the denial of her application. To show that the protected activity was a motivating factor, Plaintiff "must demonstrate that the defendant knew of the retaliation *and* knew of the plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999) (emphasis added), *citing Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1369-70 (7th Cir. 1993). In addition, in showing causation, a plaintiff "must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000), *citing Stagman*, 176 F.3d at 1001; *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). Plaintiff "cannot sustain [her] burden on summary judgment with self-serving declarations based on nothing more than [her] own speculation," *Healy v. City of Chicago*, No. 00 C 6030, 2004 WL 1630578, *6 (N.D. Ill. Jul. 20, 2004), *citing Kelly v. Municipal Courts of Marion County*, 97 F.3d 902, 911 (7th Cir. 1996), and "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek*, 202 F.3d at 918, *citing Bermudez*, 138 F.3d at 1179.

Defendants Grochowiak and Hoskins were immediately responsible for the denial of Plaintiff's business license application. Both Defendants deny any prior knowledge of Plaintiff's First Amendment activity, or of Plaintiff herself, and Plaintiff has offered no evidence to the contrary. Indeed, Plaintiff admitted during her deposition that she had no such evidence: "No, I don't have any direct evidence [that either Grochowiak or Hoskins knew of her past lawsuits or civil rights activity]. I just know that it seems that – it seems that [way] based on the illegitimate reasons they gave for denying me a home-based business license . . . ." (Plaintiff's Deposition, at 140.) As

13

noted earlier, Plaintiff never identified any "illegitimate reasons" for the denial of her business license, which on its face failed to comply with City zoning regulations. In any event, her speculation as to the decision-maker's motivation is insufficient to sustain a retaliation claim against a motion for summary judgment.

## III. Due Process Claim

In Count III, Plaintiff brings a § 1983 claim against Defendants Grochowiak and Hoskins based on a violation of her due process rights.

In order to establish a § 1983 due process claim, whether procedural or substantive, a plaintiff must identify a property interest of which she was deprived. Under the Due Process Clause of the Fourteenth Amendment, "property" consists of a "legitimate claim of entitlement." *Beischel v. Stone Bank School Dist.*, 362 F.3d 430, 435 (7th Cir. 2004), citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Such a claim is "defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577. In the zoning permit context, the Seventh Circuit has held that "unless it is established that the plaintiffs had the *right* to receive the . . . permits," a plaintiff cannot maintain a federal due process claim stemming from their denial. *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1480 (7th Cir. 1990) (citations omitted). Thus, "where a municipal ordinance provides substantive criteria which, if met, dictate the issuance of a permit, [only] an applicant who has met those criteria might assert a legitimate claim of entitlement to the permit." *Polenz v. Parrott*, 883 F.2d 551, 556 (7th Cir. 1989) (concluding that a due process claim could not be raised because the plaintiff did not show that an ordinance gave them such an entitlement).

Even if Plaintiff met the requirements established by the City's zoning ordinance, her procedural due process claim would fail. The City provides unsuccessful business license applicants with a sufficient state remedy for the allegedly "random and unauthorized" denial by Grochowiak and Hoskins. There is no deprivation of due process where adequate post-deprivation

14

procedures are provided by the state. *Village of New Burnham*, 910 F.2d at 1480, *citing Parratt v. Taylor*, 451 U.S. 527 (1981). This is true even where the deprivation was intentional. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). In the present case, the City has provided an appeals process through which applicants can challenge a denial of a business license. City of Chicago Zoning Ordinance, Ch. 17-14-0301 *et seq*. Grochowiak and Hoskins expressly informed Plaintiff that she could appeal the rejection of her application, though she chose not do so. The ordinance also provides that all decisions by the zoning board of appeals are subject to review in state court. *Id.* Ch. 17-14-0304. This is sufficient to satisfy the requirements of procedural due process. *C.L.U.B. v. City of Chicago*, 157 F. Supp. 2d 903, 913 (N.D. Ill. 2001) (provision providing for review of zoning decisions in state courts satisfies procedural due process requirements); *Village of New Burnham*, 910 F.2d at 1480 (state court remedy sufficient to satisfy procedural due process in denial of building license).

Any substantive due process claim must also fail. To begin, the court notes that the Seventh Circuit has expressed skepticism regarding substantive due process claims in the context of state-created property interests. *See, e.g., Contreras v. City of Chicago*, 119 F.3d 1286, 1294-95 (7th Cir. 1997); *Village of New Burnham*, 910 F.2d at 1480-81. In light of this skepticism, a plaintiff attempting to maintain a substantive due process claim based on a deprivation of a state-created property interest must show: (1) that the state's decision was arbitrary or irrational; and (2) that the state committed a separate constitutional violation or that state law remedies are inadequate. *Contreras*, 119 F.3d at 1295; *Doherty v. City of Chicago*, 75 F.3d 318, 325 (7th Cir. 1996). Not only has Plaintiff failed to present evidence that the denial of her business license was arbitrary, she has also failed to demonstrate that the City committed a separate constitutional violation in denying her license application, or that no adequate state remedies exist. Having failed to do so, Plaintiff cannot maintain a substantive due process claim based on the denial of her license application.

15

## IV. *Monell* Claims

Having concluded that there are no disputes of material fact concerning Plaintiff's constitutional claims, the court need not address the matter of municipal liability under the *Monell* doctrine. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994).

## V. Substantive Challenge to Zoning Ordinance

In Count VIII, Plaintiff brings claims under 42 U.S.C. §§ 1981, 1982, and 1983, alleging that the City's zoning ordinance governing home-based businesses violated her rights under the First and Fourteenth Amendments. Plaintiff claims that the ordinance's restrictions on storage violate "a basic liberty under the [C]onstitution for a business owner to be able to enter into a contract even if it is with a storage facility to store items relative to business the owner would like to conduct." (Compl. ¶ 46.) Though Plaintiff does not specifically identify it, she appears to be referring to § 4-380-060(f), which states "the home occupation [business] and all related activities, including storage, shall be conducted completely within the dwelling and shall not be operated from an accessory structure or garage." City of Chicago Zoning Ordinance, Ch. 4-380-060(f).

As an initial matter, Plaintiff fails to explain how this ordinance violates, or even involves, her First Amendment rights. Presumably Plaintiff believes that the ordinance violates her freedom of association insofar as it precludes her from doing business from her home using materials stored elsewhere. *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 764-65 (7th Cir. 2003) (challenge to zoning regulation on, *inter alia*, freedom of association grounds). The Ordinance does not, however, preclude her from entering into an agreement with a storage facility if she chooses to do so. It merely restricts her ability to contract with an outside storage facility in the course of her home-based business. For this reason, her facial challenge to the ordinance cannot succeed on First Amendment grounds.

Plaintiff's §§ 1981 and 1982 claims fare no better. Section 1981 addresses racial discrimination in the context of contractual relationships. The section states, in relevant part, "All

persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a)-(c). Section 1982, in turn, concerns racial discrimination in property transactions. It states, in relevant part, that "All citizens . . . shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. In order to bring a claim under either § 1981 or § 1982, Plaintiff must show that: (1) she is a member of a protected class; (2) the City had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the sections (i.e. contract formation or property transaction). *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996), citing *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994); *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). Although Plaintiff, as an African-American, is a member of a protected class, she has presented no evidence that the City or its employees had an intent to discriminate on the basis of race. Certainly, nothing in the record suggests that the City's passage of the zoning ordinance was motivated by racially discriminatory animus. Absent such evidence, Plaintiff's cannot proceed under §§ 1981 or 1982. *Freeman v. Chicago Park District*, 189 F.3d 613, 618 (7th Cir. 1999) ("An essential element of a § 1981 claim is that the defendants' actions be motivated by racially discriminatory animus."), citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 346 (7th Cir. 1999).

Finally, Plaintiff challenges the zoning ordinance on Fourteenth Amendment equal protection grounds, arguing that the ordinance violates the Equal Protection Clause by treating home-based businesses differently than other businesses. Specifically, the ordinance restricts the ability of a home-based business to utilize an outside storage facility, while non-home-based businesses are presumably able to store materials offsite.[11] As discussed above, the Equal

---

[11] Plaintiff herself has failed to cite the a zoning ordinance or other evidence establishing this latter proposition.

Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). When a local zoning or economic regulation is challenged on equal protection grounds, courts "consistently defer[] to legislative determinations as to the desirability of particular statutory discriminations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), *citing Lehnhausen v. Lake Shore Auto Parts, Co.*, 410 U.S. 356 (1973). Thus, the Supreme Court has stated:

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*City of New Orleans*, 427 U.S. at 303 (1976); *C.L.U.B. v. City of Chicago*, 157 F. Supp. 2d 903, 910 (N.D. Ill. 2001). Where the classification at issue negatively affects such a suspect class, the classification will be upheld only if it is "precisely tailored to serve a compelling governmental interest." *Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984), *quoting Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). In the absence of a suspect class or fundamental right, however, "to demonstrate a viable equal protection claim in the land use context, a plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d at 765; *Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000); *see also Cleburne*, 473 U.S. at 440 (unless a statute classifies by race, alienage, or national origin or encroaches on fundamental constitutional rights, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest").

The ordinance at issue here, which restricts storage options for home-based businesses, does not negatively affect any protected class. Owners of home businesses do not constitute a suspect class requiring heightened scrutiny. Nor does Plaintiff have a fundamental constitutional right in obtaining a home business license or in conducting business from home. *See, e.g., Brown v. City of Lake Geneva*, 919 F.2d 1299, 1302 (7th Cir. 1990) (liquor license does not rise

to level of fundamental right); *United States v. Williams*, 124 F.3d 411, 422-23 (3d Cir. 1997) ("it is settled that laws restricting access to specific types of private employment are subject only to rational basis review").

Under the rational basis inquiry, an ordinance is valid so long as it bears a rational relationship to legitimate governmental ends. *Forseth*, 199 F.3d at 370-71. The challenged zoning provision easily passes this test. The zoning of municipal land into distinct residential, commercial, and industrial districts is a common and accepted practice. *See generally Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (affirming zoning plan preventing owner from using property in preferred manner). As the Seventh Circuit explains, "[t]here is no question that Chicago – like any population center – has a substantial interest in regulating the use of its land and that the [Chicago Zoning Ordinance] promotes that interest." *Civil Liberties of Urban Believers*, 342 F.3d at 765. The restrictions placed on home-based businesses, such as the restrictions on offsite storage, in the words of the City, "help ensure that home-based businesses do not become so large as to destroy the residential character of the residentially-zoned areas" and ensure that "commercial enterprises cannot evade the zoning laws by pursuing what amounts to full-fledged businesses in areas zoned for residential use." (Defendants City of Chicago and Mayor Daley's Memorandum in Support of Summary Judgment, at 11-12.) Plaintiff has presented nothing to suggest that this effort to segregate residential, commercial, and industrial land uses is unrelated "to the public health, safety, morals, or general welfare" of the residents of Chicago. *Clark v. Winnebago County*, 817 F.2d 407, 408-09 (7th Cir. 1987) ("The party attacking the [zoning] ordinance bears the heavy burden of showing that the ordinance is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.") (citations omitted). The zoning ordinance does not violate equal protection.

## VI. State Law Claims

Having disposed all of the federal law claims, grounds no longer exist for federal subject

19

matter jurisdiction over Plaintiff's state law claims. See *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("a district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits"). Thus, Plaintiff's remaining state law claims are dismissed without prejudice.

## CONCLUSION

For the reasons explained above, Defendants' joint motion for summary judgment (Doc. No. 71-1) is granted as to Counts I, II, III (both § 1983 due process and conspiracy), VII, and VIII. Counts IV, V, and VI are dismissed without prejudice.

ENTER:

Dated: May 4, 2005

REBECCA R. PALLMEYER
United States District Judge